```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   --------------------------------X
                                     :
 4   DIANE TREJOS, et al.,           :
                                     :  08-CV-1477
 5              Plaintiffs,          :
                                     :
 6        v.                         :
                                     :  225 Cadman Plaza East
 7   EDITA'S BAR AND RESTAURANT, INC.,:  Brooklyn, New York
      et al.,                        :
 8                                   :
                Defendants.          :  October 20, 2008
 9   --------------------------------X

10      TRANSCRIPT OF CIVIL CAUSE FOR PLAINTIFF'S MOTION FOR
                         PROTECTIVE ORDER
11            BEFORE THE HONORABLE STEVEN M. GOLD
               UNITED STATES CHIEF MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiffs:        JENNIE WOLTZ, ESQ.
14

15

16   For Defendants:           RICHARD GOLDBERG, ESQ.

17

18

19
     Court Transcriber:        SHARI RIEMER
20                             Typewrite Word Processing Service
                               211 N. Milton Road
21                             Saratoga Springs, New York 12866

22

23

24

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service
```

1    (Proceedings began at 3;44 p.m.)

2              THE COURT: Civil Cause for Plaintiff's Motion for

3    Protective Order, <u>Trejos et al. v. Edita's Bar and Restaurant,</u>

4    <u>et al.</u>, 08-CV-1477.

5              Who will be arguing for the plaintiffs?

6              MS. WOLTZ:  I will, Your Honor.  My name is Jennie

7    Woltz.  I'm an attorney for Milbank, Tweed, Hadley & McCoy.

8              THE COURT: How are you?  Woltz is it?

9              MS. WOLTZ: Yes, W-O-L-T-Z.

10             THE COURT: Nice to see you.  For the defendants who

11   will be arguing?

12             MR. GOLDBERG:  Richard Goldberg, Your Honor, for

13   Shelley Curto, [inaudible] Schwartz, Mineo & Cohen.  We

14   represent the defendants.

15             THE COURT: So as I understand it the issues that are

16   really driving this controversy can be boiled down to the

17   discoverability of plaintiffs' tax returns, questioning of

18   plaintiffs about their tax returns and whether they filed or

19   not, the discovery of plaintiffs' immigration, travel, working

20   paper authorization documents and information or questions

21   about when the plaintiffs were in the United States or not.

22   Those are sort of the way -- that's sort of the way I've

23   broken it down into four different topics.

24             So if that helps -- you don't have to stay within

25   that rubric but if you want to get out of it maybe you can

3

1  tell me what rubric you would like me to approach it from and

2  with that in mind, I'll hear from movant plaintiffs.

3          MS. WOLTZ: Thank you, Your Honor.  The plaintiffs'

4  motion for a protective order should be granted for three

5  reasons.  The first reason is that the information that the

6  defendants have sought through the discovery of tax returns,

7  passports, visas, et cetera are -- the reasons are irrelevant

8  and overbroad and are -- and most of the information that

9  defendants attempt to seek through these documents they won't

10 actually find on the documents. For instance, most of the

11 reasons that the plaintiff -- excuse me, the defendants have

12 sought these documents or questioning about these documents

13 has to do with dates and hours that the plaintiffs have worked

14 but tax returns don't show this information.  Passports are

15 far too overbroad to show this information.

16          The second reason is that any relevant information

17 which might be obtained is far outweighed by the in terrorem

18 effect of discovery of these documents.  These documents are

19 in addition -- if they were discovered or discussed at all not

20 only would they reveal instantly plaintiffs' immigration

21 status but it will also reveal socioeconomic status, marital

22 status, home ownership status, whether they've made

23 investments, things in tax returns that one would normally

24 see.

25          THE COURT: That's easily solved by redacting the tax

4

1   returns to limit it to earned income.

2          MS. WOLTZ: That is one option, Your Honor.

3   However --

4          THE COURT: What's your position on whether the

5   plaintiffs can be asked whether they filed tax returns or not?

6          MS. WOLTZ: We do not believe that this is an

7   appropriate question that the defendants should be able to

8   ask.  If this were an appropriate question then every

9   plaintiff, every witness who appeared in any court in any type

10  of subject matter action could be asked whether they filed tax

11  returns and simply because someone hasn't filed tax returns

12  doesn't make them incredible.

13         THE COURT: In the Schnapkova [Ph.] case, are you

14  familiar with that case, Second Circuit case that Judge Levy

15  cites in the case that you cited to me, I believe, the Judge

16  Levy case being Michalski [Ph.].  You cited Michalski to me I

17  believe and it cites the Schnapkova case.  In Schnapkova, the

18  Second Circuit reversed a defendant's -- excuse me, a

19  plaintiff's verdict because the District Court in a personal

20  injury action granted an objection by the plaintiff to the

21  question about whether or not the plaintiff filed tax returns

22  and that had nothing to do with income.  That had nothing to

23  do with wages and hours.  It was an accident on the job and he

24  sued for negligence for personal injuries. He was asked, did

25  you file tax returns.  The District Court wouldn't allow the

5

1    question, the Second Circuit reversed and said that goes to

2    credibility, the plaintiff's credibility is an issue, and the

3    trial court abused its discretion in sustaining an objection

4    to that line of questioning.

5         Here, the plaintiff's credibility is key because

6    everybody agrees at least with respect to the dancers that

7    there's no documents at all other than when they went to the

8    bathroom and what videos may or may not have captured.  I take

9    it you're not going to limit the plaintiffs' claims to the

10   hours that are documented on the defendants' bathroom logs;

11   right?

12        MS. WOLTZ: Depending on how full these bathroom logs

13   and the sign-in/sign-out logs are.  I think one of the main

14   points that needs to be underscored in this case is that

15   defendants haven't produced these documents yet.  The

16   plaintiff served document requests on defendants more than

17   four months ago.  Because the defendants haven't shown us what

18   these documents contain how are we to -- how are we to figure

19   out if they are sufficient.  We have to assume at the moment

20   that they are -- since they've admitted to maintaining them in

21   both their answer and in their amended answer that they are

22   maintained.

23        But, furthermore, Your Honor --

24        THE COURT: How do you deal with the tax filing

25   issue?  I mean I'm kind of sympathetic to the argument that

1    witnesses ought not to be asked that.  I was sort of surprised

2    to see that Second Circuit case but I can't see it overruled

3    and, in fact, I've seen it applied in subsequent case law.

4            MS. WOLTZ: Your Honor, the -- on the issue of tax

5    returns, an in terrorem effect also can weigh against the

6    party's ability to test for credibility and we think in this

7    case it is distinguishable from the Schnapkova case in that

8    there's more at stake here for these plaintiffs.

9            THE COURT: Why?

10           MS. WOLTZ: These plaintiffs risk -- whether or not

11   these plaintiffs have filed tax returns is also going to be --

12   may shed light on their immigration status again and may

13   produce an in terrorem effect.

14           THE COURT: In the Judge Lindsay/Judge Seybert cases

15   that you cited to me, they were also dealing with the in

16   terrorem effect of immigration questioning, right?

17           MS. WOLTZ: Yes.

18           THE COURT: Do you know the cases I'm speaking of? I

19   can find them for you if it would be helpful.  It's the EEOC,

20   the First Wireless Group cases and there are two of them.

21   There, the tax returns were not ordered produced.  The

22   immigration status was protected.  The in terrorem effect of

23   immigration status discovery was acknowledged but the

24   plaintiffs were required to answer questions about whether or

25   not they filed tax returns.

7

1          MS. WOLTZ: In the Rangifo [Ph.] case, however, which

2     we've also cited to you, they weren't.

3          Your Honor, I think the --

4          THE COURT: The weight of authority seems to be

5     against you on that question.  Go ahead.

6          MS. WOLTZ: The other thing that I want to just

7     underscore with regard to the tax returns is that the -- how

8     do I say this?

9          THE COURT: It's up to you.

10          MS. WOLTZ: Tax returns should not be compelled in

11     this case simply to test the credibility of the plaintiff.

12     There's other ways to test the credibility in this case.  I

13     mean the defendants will have the logbooks assuming that they

14     are complete.  They'll have the bathroom logs.  They simply

15     just don't need this prejudicial forum of questioning to test

16     credibility in this case.  I think that that's the most

17     salient piece here.

18          THE COURT: Let me ask you about the -- actually in

19     the Rangifo case what Judge Ellis protected was the tax ID

20     number and social security number.  I don't think the opinion

21     speaks directly about whether or not they filed tax returns.

22     Can you show me a portion of his opinion that you cited where

23     the judge upheld or addressed even the discoverability of

24     whether or not tax returns were filed?

25          MS. WOLTZ: Excuse me, Your Honor.  I may have gotten

8

1  confused.

2          THE COURT: It's okay.  I just want to make sure the

3  record is clear before we leave it. Take your time. It's a

4  short opinion, at least the one I'm looking at, the one that's

5  reported at 2007 Westlaw 894376.

6                    [Pause in proceedings.]

7          MS. WOLTZ: Your Honor, I don't have the opinion on

8  me.

9          THE COURT: I'll lend you my copy t make sure it's

10  the one you're thinking about and see if I'm overlooking

11  something where in fact it holds that whether one filed tax

12  returns or not is not discoverable as you suggest.

13                    [Pause in proceedings.]

14          MS. WOLTZ: Your Honor, on Page 3 of the Rangifo

15  decision the party had -- excuse me, the tax returns are being

16  compelled to test the credibility of the plaintiffs.  However,

17  the Court says that the opportunity to test the credibility of

18  a party based on representations made when seeking employment

19  does not outweigh the chilling effect that disclosure of

20  immigration status has on the employees when seeking to

21  enforce their rights.

22          THE COURT: So it doesn't address the question of

23  whether at a deposition the plaintiff may be asked did you

24  file a tax return reflecting the income that you earned while

25  you were working for me.  It doesn't address that question.

1          MS. WOLTZ: Not directly but the idea is that the

2   credibility should not be tested.

3          THE COURT: I think the idea is that the credibility

4   should not be tested by access to the tax ID number which

5   would go to immigration status, not the filing or failure to

6   file.  I agree with you that intellectually they are analogous

7   but the case law does seem to draw a distinction between them.

8          Before I give the defendants the floor, I would like

9   to ask you one other question.  We can certainly agree, I

10  think, that one of the disputes in this case that we're

11  entitled -- both sides are entitled to discover are what the

12  claims are about what hours were worked and what evidence

13  there is about what hours were worked.

14         MS. WOLTZ: That is true.

15         THE COURT: The defendant has asserted or the

16  defendants have asserted, excuse me, that they have a good

17  faith basis for believing that the plaintiffs were out of the

18  country or some plaintiffs were traveling outside of the

19  country during part of the time that they were claiming to be

20  working for the defendants.

21         I understand and I appreciate the briefing that

22  brought sharper into focus the question of the in terrorem

23  effect of questioning and document production going to

24  immigration status, but what would the plaintiffs' position be

25  if we were to craft a vehicle for the communication of the

1   information about travel without communication about

2   immigration status?  In other words, I would propose that the

3   plaintiffs be required to sit down with their counsel with all

4   documents, whether they include passports or what have you,

5   and I don't know how the plaintiffs traveled and I'm not

6   asking, but all documents that they have reflecting any travel

7   and that plaintiffs' counsel be prepared to certify or have

8   plaintiffs submit affidavits -- I'd be open as to the vehicle

9   where they can say we instructed the client, we received a

10  volume of documents, we reviewed the documents and the travel

11  reflected is the following, and that that way the travel

12  information on any travel documents, whether they're in the

13  plaintiffs' own name or not, whether they're in the country of

14  origin that they represented or not, whether they're under an

15  A number or not can be revealed without disclosure of the

16  underlying immigration related data.

17          MS. WOLTZ: Your Honor, I think that that's an

18  excellent suggestion.  The plaintiffs would have no problem

19  getting a vehicle out to show how they traveled.  But it is

20  still overbroad in terms of when the plaintiffs were indeed at

21  work or not.

22          THE COURT: Why?  If they're claiming that they were

23  at work forty hours a week fifty weeks a year and they

24  traveled six months a year, how is that overbroad?

25          MS. WOLTZ: I see your -- I see what you mean, Your

11

1  Honor.

2          THE COURT: Okay.

3          MS. WOLTZ: So you would leave that to the parties to

4  negotiate that?

5          THE COURT: Can I hear from the defendants?

6          I'll give you a ruling before we leave today but

7  that's where I'm headed and I want to give you an opportunity

8  to tell me if you see a problem with it.

9          MR. GOLDBERG: Thank you, Your Honor.  Richard

10  Goldberg.

11          THE COURT: Mr. Goldberg.

12          MR. GOLDBERG: If I could hand up, Your Honor, it

13  might be helpful.  These are the documents that we did get

14  from the plaintiffs which we referred to the brief which you

15  have before you.

16          THE COURT: Thank you.  I understand you haven't

17  gotten anything yet.  You haven't given anything yet either;

18  right?

19          MR. GOLDBERG: Well, I think Your Honor at the last

20  conference indicated it would be a mutual swap and that's

21  where we --

22          THE COURT: So you've been waiting for this ruling,

23  is that it?

24          MR. GOLDBERG: I thought that we -- we thought that

25  when you had the telephone conference that's what you were

1  doing, we would --

2        THE COURT: Okay.  We'll set a date for you to meet

3  with each other's documents.

4        MR. GOLDBERG: Fine.  I think first on the issue --

5  let me take it a little bit in reverse.  Your Honor just

6  indicated the matter of the travel documents.  I think we

7  actually addressed that at Page 16 of our reply, sur reply,

8  I'm sorry, at the bottom where we said and I'll quote

9  "Defendants could care less whether the plaintiffs are

10  immigrants."  The in terrorem effect here is a red herring.

11  We are not interested in the plaintiff's immigration status.

12  We are, however, very interested in where they were and the

13  passport part of the document that has the stamp that shows

14  you you're in and out of the country, that shows you in one

15  very neat place where you were and where you were is important

16  to determine part of their own economic reality test which has

17  to do with permanence of the employment, dependence on the

18  employment. These issues of the economic reality test, which

19  is only one part of the case, are incredibly fact sensitive.

20  They can be manipulated, massaged in all sorts of ways.  You

21  can wordsmith them.  You can show, draw all kinds of

22  conclusions based on the different prongs of the economic

23  reality test.

24        One of the leading parts of that prong, one of the

25  leading prongs of the test, I'm sorry, is whether you are

13

1  dependent on the employment that you have and dependency on

2  employment is one of the key issues to show whether or not you

3  are an employee.  Dependency on employment has to do very much

4  with well, where else are you employed and what do you earn at

5  those other places.

6          All of the documents that they agree to give us in

7  the document requests all have to do with information that I

8  would call internal information about what they say we paid

9  them but every inquiry we make by tax return, loan document,

10  application for loans, application for social services

11  assistance where the question would be put likely and asked in

12  any of those documents where else do you work, what do you

13  earn.  They say in this motion that they're not going to give

14  it to us and that's in Document Request 1, 2, 36, 38, 39, 42

15  and 43.  Those are the only places where I believe if I look

16  at it again we have asked what other documents do you have

17  that shed light on your claim about where you worked, for how

18  long and for how much.  Those documents go very much to the

19  question of economic dependence.  They go very much to the

20  issue of permanence of employment and other facets of the very

21  economic reality test that they're talking about.

22          Also, those documents also address issues about

23  their actual earnings, what they claimed they earned with us,

24  what they claim they weren't paid by us, how many hours did

25  they work with us.  The complaint here alleges hours worked

14

1   that range from I think thirty, twenty to thirty to a hundred

2   and thirty hours a week.  If I read it correctly there's a

3   very wide range of hours.  How do we test whether or not that

4   they're claiming that is so?  Part of the problem we have --

5           THE COURT: You want documents showing their other

6   employment if they had any?

7           MR. GOLDBERG: Sure.  And the tax returns uniquely

8   show that information.

9           THE COURT: If you got a tax return that was redacted

10  to show simply the name of the taxpayer and any information on

11  it declaring any earned income you should be satisfied.

12          MR. GOLDBERG: Yes, and one other possible area that

13  we -- because we don't know what's in that and I don't know

14  the level of sophistication of the tax returns that these

15  people filed.  They haven't told us.

16          But take, for example, the issue of the dancer

17  plaintiffs.  Now, the very claim we've made in the case is

18  that the dancer plaintiffs are not our employees. In fact, we

19  kept very few records about those.  We didn't pay them.  The

20  dancer plaintiffs at some juncture began to purchase their own

21  dance dress, their own dance uniforms if you will.

22          THE COURT: You want business expense deductions if

23  they took them.

24          MR. GOLDBERG: Business expense deductions. How did

25  you treat it?  Maybe you did, maybe you didn't.  Certainly if

1   you did another piece of evidence having to do with employee

2   status.  The reason I only bring out that particular fragment

3   is one of the cases that they cite that I think really points

4   it up, there was a case called Twitfort [Ph.] I think, one of

5   the --

6                THE COURT: I didn't focus on that one.

7                MR. GOLDBERG: One of the cases they cited. We talked

8   about it in the reply brief in our sur reply.  It's a case

9   involving I think it was tailors who had worked offsite in

10  their own homes producing piece goods for garment "employers."

11               THE COURT: Right.

12               MR. GOLDBERG: What happened was in that case one of

13  the -- the issue was are the tailors under the Fair Labor

14  Standards Act or not.  The Court I think held that -- it was a

15  case dealing with the ultimate fact, not discovery, which I

16  want to talk about just briefly at the end.  But the case

17  talked about the ultimate fact the Court was being asked to

18  decide the ultimate fact, are they employers or not.  One of

19  the tailors there was a fellow named, no relation, Goldberg.

20  Goldberg hired fourteen other tailors and the Court held --

21  asked Goldberg since he hired fourteen other tailors it kind

22  of looks like he's in his own business and therefore certainly

23  he is an independent contractor, but as to the others we're

24  not sure and the Court held that there was only "fragmentary

25  evidence" about what the actual facts were concerning the

1  other alleged employers -- alleged employees and the Court I

2  think ultimately held against the employer defendant because

3  the Court held you only had fragmentary evidence about these

4  issues.

5       The point is is that because these issues are so

6  fact sensitive at the end of the day given the paltry kind of

7  documentation we get concerning these people because they're

8  in control of it, we only have fragmentary evidence and we are

9  seriously prejudiced from a very real evidentiary standpoint

10  because we cannot defend against the claims they're making

11  other than what comes out of their mouth.  We have no -- zero

12  documents to really attack those issues substantively and by

13  impeachment.

14       You've already mentioned the point about

15  impeachment.  I think it's the Michalski case where the Court

16  held that obviously I think issues about whether you filed a

17  tax return in the first place deal with credibility and

18  whether you make statements in those tax returns I would say

19  that are false or true also go to credibility and are

20  important matters for cross-examination not only for

21  credibility but also substantively to challenge what it is

22  you're saying about where you worked, how long you worked and

23  whether you depended on us.

24       THE COURT: You know about the goose and the gander,

25  right?  I lost you but you know what I'm saying.  What I'm

1   saying is be careful what you ask for because it will only

2   spawn the same requests of your client that you make of the

3   plaintiffs.

4           MS. WOLTZ: May I respond, Your Honor?

5           THE COURT: When he's done.

6           MR. GOLDBERG: The other thing -- I appreciate that

7   instruction, Your Honor.

8           The other thing that I just want to point out is

9   that to a large degree many of the cases that the plaintiffs

10  cite have to do with what I would call ultimate fact issues

11  where the Court is being asked to determine is this defendant

12  -- is this plaintiff an employee or not.  They are not

13  strictly speaking discovery cases --

14          THE COURT: I understand.

15          MR. GOLDBERG: The one case that I have here, Your

16  Honor, which was Sanborski, one of the cases we -- I think

17  both sides may have made reference to it.  The Court made a

18  specific reference that the objections were overruled as to

19  the request of discovery drawing the particular distinction

20  that this is only the discovery stage and that there is yet to

21  be further determinations about admissibility of evidence

22  later on but for purposes of preparation of defense discovery

23  is broader and the Court made that distinction.

24          THE COURT: Thank you very much, Mr. Goldberg.

25          Ms. Woltz, you wanted another word?

18

1          MS. WOLTZ: Yes.  Thank you.

2          THE COURT: Please go ahead.

3          MS. WOLTZ: The defendants have made repeated

4    assertions that plaintiffs have failed to produce documents in

5    this case but plaintiffs have actually produced documents

6    responsive to 39 out of defendants' 45 document requests.  So

7    we've produced everything that they've asked for except with

8    respect to these seriously prejudicial and irrelevant

9    documents.

10          Secondly, it's irrelevant what the plaintiff --

11   excuse me, what the defendants' motives are for discovering

12   immigration status.  These documents will still reveal

13   immigration status and then the in terrorem effect applies.

14          Thirdly, the defendants spent a lot of time

15   discussing what or -- in his oral argument right here that

16   it's very relevant what the plaintiffs have earned but it's

17   not.  First of all, there's no debates between the plaintiffs

18   and the defendants that the plaintiffs' dancers have earned

19   nothing from the defendants.  They don't dispute that.  We

20   don't dispute that.

21          THE COURT: But if they were earning thirty or forty

22   thousand dollars a year from another employer surely it would

23   go to their claim that they were working as many hours as they

24   say they worked for the defendant.

25          MS. WOLTZ: If they earned thirty or forty thousand

19

1   dollars from the Flamingo you're saying?

2            THE COURT: No, from another employer it would make

3   it less believable that they had the time to work the number

4   of hours that they claim to have spent working for the

5   defendants.  None of these plaintiffs are claiming that they

6   worked ten or fifteen hours a week at the defendants, are

7   they?

8            MS. WOLTZ: No, all of them are more than that.

9            THE COURT: Yes.  So they --

10           MS. WOLTZ: But why would the amount of what they

11  made at another job -- you don't know what they're getting

12  paid at the other job because they could be making --

13           THE COURT: $100,000.00 an hour, it's true. I don't

14  know.

15           MS. WOLTZ: Also, I mean the dancer plaintiffs were

16  working at night.  They could have had day jobs during the day

17  that would --

18           THE COURT: But it's discovery.  They're entitled to

19  find out.  That's what I --

20           MS. WOLTZ: It is discovery, Your Honor.  However,

21  but this Court must realize that the plaintiffs are entitled

22  to have other jobs.  Employees --

23           THE COURT: It's not -- if they have other work and

24  the defense moves for summary judgment on the grounds that the

25  plaintiffs had other employment you may bring a Rule 11 motion

20

1    if that's the sole basis of their Rule 56 application.

2              MS. WOLTZ: Okay.  I just want to impress upon Your

3    Honor that whether the plaintiffs had two different jobs did

4    not make them any less dependent upon the Flamingo for having

5    that job.

6              So I have one more point.

7              THE COURT: Take your time and make it as you like.

8              MS. WOLTZ: Thank you.  Defendants have also stated

9    this idea of fragmentary documentary evidence.  First of all,

10   we obviously need to see what these logbooks look like.  If

11   these logbooks are kept the way that the plaintiffs allege and

12   the defendants admit every single day that the dancer

13   plaintiffs signed in, every time they went to the bathroom

14   there should be a record of it.

15             But, furthermore, because even if we were to -- even

16   if this Court were to order discovery of tax returns the

17   defendants aren't going to get that information from the tax

18   returns.  They're not going to get all that information from

19   the passports.  So they could win on this but he still won't

20   have all the information they need to make it non fragmentary.

21   That's very relevant.  We have to see these documents for what

22   they are and for what they're going to contain.

23             But even if these documents do contain a modicum of

24   relevant information here, there's no case that the plaintiffs

25   have found, no case that the defendants have found that says

1   defendants' failure to maintain documents should be

2   compensated for by plaintiffs revealing sensitive and

3   irrelevant documents.

4          THE COURT: Let's talk about the [inaudible] for a

5   minute.  Let's assume I enter an order that says the

6   plaintiffs have to produce any documents they have reflecting

7   the income that they earned -- I don't mean investment income.

8   I mean earned income, wages, salaries, tips, et cetera, the

9   income that they earned and the expenses that they incurred

10  earning them whether it's in tax returns or not, but if it is

11  in tax returns they can redact every other bit of information.

12         The only in terrorem effect of that ruling that I

13  can discern would be that it would force plaintiffs who didn't

14  file tax returns to acknowledge that fact.  I'm sensitive to

15  that argument. The problem with it is that the cases that you

16  and I discussed at the beginning of your argument says that

17  that very fact is the one that the defendants are entitled to

18  cross-examine the plaintiffs about anyway.  So if I have to

19  allow even if it might not be my preference if I were writing

20  on a clean slate, if I have to allow under Second Circuit rule

21  the question plaintiff A, did you file a tax return for 1997,

22  the first year of your lawsuit.  If I have to allow that

23  question at plaintiff A's deposition, how am I further

24  imposing an in terrorem effect if I say if you filed a tax

25  return because the amount of income you declared and the way

22

1  you declared it and the expenses you declared and the way you

2  declared them is arguably relevant and Rule 26 gives broad

3  discovery and the defendants have crafted the possibility of

4  an argument, how is that additionally in terrorem if it is?

5          MS. WOLTZ: How is it additionally? It would not be.

6          THE COURT: I appreciate your candor.  Thank you.

7          Is there anything else you want to tell me?

8          MS. WOLTZ: I think that's it, Your Honor.  I think

9  you have understood our points as far as the tax returns even

10  as the way that -- the way that the plaintiff in this case has

11  filled out their tax returns is also only going to be slightly

12  subjective.  So even -- it won't be this objective factor that

13  the Court is going to be able to use with sufficient -- it

14  just won't be able to use in the economic reality test.  So

15  even with regard to anything they write on their tax return or

16  how they've characterized their income the Court should also

17  be cognizant of that especially considering they're

18  unsophisticated.

19          THE COURT: Thank you.  Anything else from the

20  defendant?

21          MR. GOLDBERG: No, Your Honor.

22          THE COURT: Thanks.

23          MR. GOLDBERG: Thank you, Judge.

24          THE COURT: So just to review.  If I give you

25  guidance on the four points that I articulated at the

23

1  beginning and we arrange a date for the mutual exchange of

2  documents I will have covered the issues raised in your

3  motion.  You don't need a document demand by document demand

4  ruling or an interrogatory by interrogatory ruling.  I think

5  we're agreed on that.

6          MS. WOLTZ: Your Honor, I don't believe the

7  plaintiffs have any more documents responsive to these

8  requests.

9          THE COURT: Other than the ones that are at issue.

10         MS. WOLTZ: Other than the ones that are at issue.

11         THE COURT: I understand that.  I'm saying as opposed

12  to going demand by demand as to one, the objection is

13  sustained in part and denied in part for the following reasons

14  as to -- I'd like to give you a generic ruling and allow you

15  to --

16         MR. GOLDBERG: The one I guess area where we weren't

17  just dealing with tax returns, travel documents I believe

18  were -- there were matters regarding loan applications and

19  matters --

20         THE COURT: I'm going to handle that --

21         MR. GOLDBERG:  -- and I think the --

22         THE COURT: Got it. I'm going to deal with that.

23         MR. GOLDBERG:  -- social services documents which

24  I --

25         THE COURT: I'm going to deal with that.  Thank you.

24

1          MR. GOLDBERG: That's fine, Judge.

2          MR. KUSHNER:  If I may, Judge.

3          THE COURT: Sure.

4          MR. KUSHNER:  There was a statement --

5          THE COURT: Just tell me who you are.

6          MR. KUSHNER: Gary Kushner for --

7          THE COURT: Mr. Kushner, what?

8          MR. KUSHNER:  There was a statement made also in

9    writing before in response to the discovery demand that we

10   were getting 39 categories of documents.  What was shown to

11   you earlier today certainly falls short of 39 documents.

12          THE COURT: Thank you.

13          For the reasons I've already stated, I feel bound to

14   consider, to take into account as I make my ruling that a

15   failure to file tax returns is discoverable, admissible and

16   indeed can be the grounds for reversible error if objected to,

17   and therefore the in terrorem effect of tax return disclosure

18   is mitigated if not eviscerated in this case.

19          In reaching that conclusion I look at decisions like

20   the Schnapkova case reported at 985 F.2d 79 with the relevant

21   discussion at Pages 82 and 83, the Chambly v. Harris & Harris

22   case reported at 154 F. Supp. 2d 670 which relied on

23   Schnapkova, the Judge Levy decision in Michalski which is

24   cited by the parties, 935 F. Supp 203 at Page 208, and the two

25   decisions in EEOC v. First Wireless Group authored by Judge

25

1    Seybert also cited by the parties and reported respectively at

2    225 F.R.D. 404 and 2007 Westlaw 586720.

3            I also take into account the sensitivity with which

4    courts approach immigration status and acknowledge that it

5    stands in some distinction to the way tax filing status is

6    treated but that's the law that I find myself being directed

7    to apply by the Circuit and seen applied by my fellow judges.

8    In particular, I found the discussion in the Flores v. Amagon

9    case reported at 233 F. Supp. 2d 462 about the reasons courts

10   should be sensitive about immigration status to be

11   informative.  We also see it in the Wireless Group decisions

12   I've already referenced and in the Rangifo case that Ms. Woltz

13   referred to during her argument.

14           There are indeed cases where even tax returns

15   themselves have been discovered in response to a demand by a

16   defendant in an FLSA case for information about other

17   employment of plaintiffs.  One such case is Canada v. Hotel

18   Development Texas.  It may be cited by the defendants in their

19   papers. I think that's how I learned of it and --

20           MR. GOLDBERG: Yes, Your Honor.

21           THE COURT:  -- it's reported at 2008 Westlaw

22   3171940.  The fact that dancers declared themselves to be

23   self-employed was admitted as relevant albeit in a state court

24   proceeding in State of Oregon v. Acropolises McLaughlin

25   reported at 945 Pacific 2d 647, an Oregon state court decision

26

1   although federal cases do indicate that a plaintiff subjective

2   belief may be irrelevant and I'm looking at the Hopkins case

3   cited by the plaintiffs there.

4           So what I distill from all of this case law is that,

5   and you could see where I'm going, the information about

6   income earned is relevant.  Whether it's on tax returns or not

7   it needs to be -- the defendants have a right to discover it

8   and if it's on tax returns or if the plaintiffs are -- if the

9   plaintiffs are required to acknowledge in answering that

10  interrogatory that they didn't file tax returns well, the case

11  law says that's okay.  In fact, if I protected it and the

12  plaintiffs prevailed and the defendants cited the Schnapkova

13  case, the judgment in plaintiffs' favor might well be

14  reversed.

15          So the first part of my order is that the motion for

16  a protective order is granted insofar as the plaintiffs will

17  not be required to make wholesale disclosure of tax returns,

18  social service applications, mortgage applications, et cetera,

19  but it is denied in that the plaintiffs will be required to

20  produce all documents in their custody and control or

21  possession that reflect any income that they earn as employees

22  or independent contractors and any expenses that they incurred

23  in connection with earning that income during the time period

24  at issue in the complaint.

25          To the extent that those documents contain other

1  information, whether it's a social security number or an A

2  number or a taxpayer ID number or a home address or an alimony

3  payment or a social services predicament, redaction is

4  acceptable to the Court.  What's important is that if the

5  document is in the possession, custody or control of a

6  plaintiff and it reflects any income that the plaintiff earned

7  through labor whether as an independent contractor, a sole

8  proprietor or an employee during the time period at issue it

9  be turned over.  The fact that it's a tax return or a loan

10  application will not shield it from disclosure.

11      Whether or not any party filed appropriate tax

12  documents may be required of at deposition.

13      With respect to travel, the plaintiffs will meet

14  with their counsel.  They will be directed to provide for

15  their own attorney's eyes only all documents in their

16  possession, custody or control including passports that

17  reflect their travel.  Counsel in order to protect the

18  immigration status of their clients will prepare a schedule of

19  all the travel that these documents reflect and it will

20  provide that information in the form of an interrogatory

21  answer I deem propounded now for the time period during which

22  the plaintiffs claim they did not receive appropriate wages

23  under law.

24      At the same time that information is transmitted so

25  too will the defendants provide documents responsive to

1  plaintiffs' demands.  Tell me how long you need, plaintiffs.

2  I assume the defendants have that material ready to go and so

3  the question is how long the plaintiffs need to respond to my

4  order so that we can set a date for that to happen.

5          MS. WOLTZ: I think we would need about three weeks,

6  Your Honor, in order to contact all of our plaintiffs to get

7  that information.

8          THE COURT: So if that's correct, you should be able

9  to make this disclosure -- why don't we say to be safe by

10 Friday, November 14th. That's three-and-a-half weeks.

11         Do we have a case management order in place that

12 gets depositions going and --

13         MR. GOLDBERG: We did, Your Honor, but that has been

14 mooted by virtue of the protective order application.

15         THE COURT: I know that I was a little short with you

16 on the phone the last time we spoke and a little sarcastic.  I

17 regret that.  I hope -- you caught me on a bad day but frankly

18 I don't remember.  Part of my frustration is one that I've

19 expressed before.  I'm looking at eight people sitting around

20 the table in a case that the plaintiffs are going to want

21 fees, the defendants are going to complain they're a small

22 business and they're being ground into a settlement posture

23 that they don't want to take because of the expense of

24 litigation and it is frustrating to me see that and that's why

25 the notion that we're relitigating this issue and I will

1  concede that I was not alert to all of the case law and I'm

2  grateful that I've had the opportunity to educate myself in it

3  but I don't think we're coming out that differently than we

4  were before.  So it is a source of some frustration to me to

5  see us finding so much difficulty and so much vitriol over

6  discovery because it portends a long protractive litigation

7  with a lot of lawyers and a lot of time and frankly most of

8  these cases don't involve hundreds and hundreds of thousands

9  of dollars and so we spend more time lawyering it than the

10  claims can economically support because of the artificiality

11  of the fee shifting statute and some of the other issues

12  involved.  So that is a source of frustration to me and I hope

13  that we can find a way to move forward more efficiently and

14  with less discovery motion practice and satellite litigation

15  and more accommodation of each other's needs especially when

16  the case law recognizes them.

17          November 14th for the exchange of documents.  We

18  have a couple of different groups of plaintiffs.  I imagine

19  we're going to have a 216(b) application at some point.  Is

20  that in the cards?  I don't mean to refer to a statute that

21  you're not familiar with.

22          MS. WOLTZ:  Oh, the collective action?

23          THE COURT:  Yes.

24          MS. WOLTZ:  I think we wanted to -- if I remember

25  correctly from the June 20th conference, Your Honor, you

30

1   wanted to establish whether or not he dancers were indeed

2   employees before we started that.

3          THE COURT: It seems logical to do that because when

4   I read about the case in your motion papers I get concerned

5   about the fact that the dancers on the one -- similarly

6   situated plaintiffs are a requirement of a collective action

7   and I'm not sure if we have a group of plaintiffs who were

8   paid and apparently given W-2s but complain about

9   discrepancies in their hours and a group of plaintiffs who

10  weren't paid but claimed they should have been that we can

11  call them similarly situated.  I haven't contemplated that but

12  it's a complication we won't confront if we have dispositive

13  motion practice on the dancers before we have a 216(b).

14         Now, the other thing we could do is amend and file

15  two separate complaints I suppose and avoid the issue that

16  way.  One of the things for the parties to think about is that

17  I suppose if we have dispositive motion practice with respect

18  to the dancers and the defendants win another wave of dancers

19  could come forward and sue. I don't know what the limitations

20  issues are and how they relate to what time frame we're at,

21  but the state law has a six-year statute, right?  So that's

22  pretty long.

23         MR. GOLDBERG: Breach of contract, Your Honor.

24         THE COURT: New York State minimum wage law is what

25  I'm thinking has a six-year statute.

1          MR. GOLDBERG: I'm not sure if it's specifically

2   that.

3          THE COURT: The FLSA has a two-year statute, three

4   years for willful if I recall correctly, and the New York

5   State law is six years.  On the other hand, I'm not sure

6   216(b) solves that problem because if a plaintiff does not opt

7   in I don't think they're bound by the disposition.  It's only

8   an opt in. It's not an opt out.  So it may be that absent a

9   Rule 23 motion practice tut, tut, tut, we can't solve this

10  problem anyway.

11         MS. WOLTZ: I think all parties would prefer it if we

12  came to some -- if we could come to a resolution which would

13  obviate the need for all of this.  I suppose we're hopeful at

14  this time this is something we could still work out.

15         THE COURT: You're talking about a settlement?

16         MS. WOLTZ: That would be one option.

17         THE COURT: What else did you have in mind?

18         MS. WOLTZ: If the ruling on the dispositive -- on

19  the employee status of the dancers if they all become -- if

20  they all become employees then we only have one class.

21         THE COURT: Well, that's fine with me. Obviously it

22  belays the ultimate resolution of the litigation but it might

23  be a more efficient way to go.

24         So let's say that we exchange these documents on

25  November 14th.  How long after that are we going to take to

1   discover the -- to take deps related to the dancers and be

2   ready for motion practice on that issue?

3          MR. GOLDBERG: What Your Honor had directed was not

4   to take all of the dancer plaintiff depositions, select five

5   or so.

6          THE COURT: It makes sense.

7          MR. GOLDBERG: And we're prepared to do that.  So in

8   contemplation I would say that we could go forward two weeks,

9   three weeks after we have an opportunity to look at some of

10  the documentation that is provided to us.  The beginning of

11  December.

12         THE COURT: How much time do you think it will take

13  to accomplish it?

14         MR. GOLDBERG: It could take five depositions.  The

15  problem that we have here is translation.  It gets expensive

16  when you need a translator and then ordering transcripts.  So

17  I would think probably 45 days.  The holiday season and all of

18  that.

19         THE COURT: Right.  So first wave of deps will be

20  done by let's say January 23rd and we'll conference the case a

21  week or so thereafter say on February 5th at eleven.  Is that

22  agreeable to everyone?

23         MR. GOLDBERG: Yes, Your Honor.  An in personam

24  telephone conference?

25         THE COURT: In person.  I think with this one I like

1  to get my hands on you.

2         MR. GOLDBERG:  Can I address something that you

3  said, Your Honor, in your ruling?

4         THE COURT: Yes, sir.

5         MR. GOLDBERG: You indicated insofar as the redaction

6  part of something that is a tax return or -- you indicated

7  that social services, income generated from social services

8  could be redacted.

9         THE COURT: Yes.

10        MR. GOLDBERG: But I could contemplate and I do

11 contemplate a situation where the social services benefit

12 stems from a claim that they were unemployed.

13        THE COURT: I understand.

14        MR. GOLDBERG: And, therefore, that goes to not only

15 impeachment issues but also what they're -- what they were

16 working for at the time.  So I ask you to be sensitive about

17 that issue and --

18        THE COURT: I understand your point but it's one

19 thing to be bound by case law that says that whether you filed

20 a tax return or not is a legitimate cross-examination

21 question.  I didn't see in the case laws that the protection

22 that otherwise applies to tax returns can be lifted if the

23 defendant can come up with a potential lie on them and check

24 the tax return to see if it's there or not.

25        MR. GOLDBERG: But you didn't order wholesale

1  production of other documents and we did ask for a document

2  that would relate to a plaintiff who may have made an

3  application to a social services agency for unemployment

4  insurance.  If they're unemployed and they received those

5  benefits then how could it be that they're employed by us at

6  the same time unless that plaintiff is not telling the truth?

7          THE COURT: Okay.  I understand your point but I am

8  standing by my ruling that says that documents that reflect

9  income earned must be disclosed.  You can ask the plaintiffs

10  at their deposition did you receive unemployment benefits

11  during any of this period of time and I'll enforce that

12  question.

13          MR. GOLDBERG: Thank you, Judge.

14          MS. WOLTZ: Can I just ask a clarifying question

15  about is the January 23rd date the date by which all

16  depositions, plaintiffs and defendants are to be done?

17          THE COURT: Yes.  That's what I contemplated for the

18  dancer motion practice.

19          MS. WOLTZ: Great.

20          THE COURT: Is dancers an appropriate term to put in

21  the order?

22          MS. WOLTZ: That's fine.  They're like hostesses.

23          MR. GOLDBERG: In our original wave of discovery we

24  also included one or two bartenders, employee type.  So that's

25  what we intend on doing unless the Court wants to stifle that.

35

1          THE COURT: I have -- I don't want to stifle anything

2     that moves the case forward faster.  If you want to get some

3     of that work done while we're doing this, that's great too.

4          MR. GOLDBERG: Okay.  It was mostly going to be done

5     for comparative purposes.

6          THE COURT: That's fine.  Anything else?

7          Enjoy your day.

8          MS. WOLTZ: Thank you.

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                   _____

6                       Shari Riemer

7  Dated:  October 23, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25